**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**

**AMANDA MOSLEY**, individually and on behalf of all others similarly situated,

*Plaintiff,*

v.

**ARKANSAS FEDERAL CREDIT UNION,**

*Defendant.*

Case No. 2:25-cv-02101

AMENDED CLASS ACTION COMPLAINT

JURY DEMAND

## AMENDED CLASS ACTION COMPLAINT

COMES NOW Plaintiff Amanda Mosley, individually and on behalf of all others similarly situated, and on behalf of the general public, upon personal knowledge of facts pertaining to her and upon information and belief as to all other matters, and by and through undersigned counsel, hereby brings this Class Action Complaint against Defendant Arkansas Federal Credit Union ("AFCU" or "Defendant"), and alleges as follows:

## INTRODUCTION

1. Plaintiff brings this action on behalf of herself and Classes of similarly situated individuals against AFCU over the improper assessment of (a) Overdraft ("OD") Fees on debit card transactions authorized on sufficient funds, (b) OD Fees on ATM transactions and one-time debit card transactions, and (c) multiple fees on an item that the accountholder only presented for payment once.

2. Besides being deceptive, these practices breach Defendant's Privilege Pay Service Agreement (the "Opt-In Form") (**Exhibit A**).

3. These practices also breach Defendant's duty of good faith and fair dealing,

alternatively unjustly enriches Defendant to the detriment of its customers, violates the Arkansas Deceptive Trade Practices Act ("ADTPA"), Arkansas Code Annotated ("A.C.A.") § 4-88-101, *et seq.*, and violates the Electronic Fund Transfers Act, 15 U.S.C. § 1693, *et seq.* ("EFTA"), and Regulation E thereto, 12 C.F.R. § 1005 *et seq*. (authority derived from 15 U.S.C. § 1693 et seq.).

4. Defendant's improper scheme to extract funds from account holders has victimized Plaintiff and hundreds of other similarly situated consumers. Unless enjoined, Defendant will continue to engage in these schemes and will continue to cause substantial injury to its consumers.

**THE PARTIES**

5. Plaintiff Amanda Mosley is a resident of Fort Smith, Sebastian County, Arkansas and has maintained a checking account with Defendant at all times material hereto.

6. Defendant Arkansas Federal Credit Union is a credit union with greater that $2.7 billion in assets. Defendant maintains its headquarters and principal place of business in Little Rock, Pulaski County, Arkansas. Defendant maintains 16 branches and/or ATMs throughout Arkansas.

**JURISDICTION AND VENUE**

7. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §1332(d) because there are more than 100 Class Members, at least one class member is a citizen of a state different from that of Defendant, and the amount in controversy exceeds $5 million, exclusive of interest and costs.

8. This Court has personal jurisdiction over Defendant because it maintains its principal place of business in Arkansas.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events, acts, and omissions giving rise to Plaintiff's and Class Members claims occurred in this District.

## FACTUAL BACKGROUND

10. In 2021, the largest financial institutions in America charged customers almost $11 billion in overdraft fees. Customers who carried an average balance of less than $29.500 paid 84 percent of these fees. Why Poverty Persists in America (The New York Times, Mar. 9, 2023), https://www.nytimes.com/2023/03/09/magazine/poverty-by-america-matthew-desmond.html.

11. Because of this, industry leaders like Bank of America, Capital One, Wells Fargo, Alliant, and Ally have made plans to end the assessment of OD or NSF fees entirely. *See* Hugh Son, *Capital One to Drop Overdraft Fees for All Retail Banking Customers*, NBC News (Dec. 1, 2021), https://nbcnews.to/3DKSu2R; Paul R. La Monica, *Wells Fargo Ends Bounced Check Fees*, CNN (Jan. 12, 2022), https://bit.ly/3iTAN9k.

12. Regulators have also found that the practice of assessing multiple fees on an item is unfair regardless of account opening disclosures. *See* CFPB Supervisory Highlights, Junk Fees Special Edition, Issue 29 (Winter 2023) at 5, available at https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-junk-fees-special-edition-issue-29-winter-2023/ (condemning the same multiple fee practices at issue here); *see also* CFPB, Supervisory Highlights Junk Fees Update Special Edition, Issue 31, Fall 2023, available at https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-junk-fees-update-special-edition-issue-31-fall-2023/; *see also* Overdraft Protection Programs: Risk Management Practices, Consent Order, OCC Bulletin 2023-12 (Apr. 26, 2023), available at https://occ.gov/news-issuances/bulletins/2023/bulletin-2023-12.html "[e]ven when customer disclosures explain that a single check or ACH transaction may result in more than one fee, a bank's practice of assessing fees on each representment may also be unfair… if consumers cannot reasonably avoid the harm").

13. Through the imposition of these fees, Defendant has made substantial revenue to the tune of tens of millions of dollars, seeking to turn its customers' financial struggles into revenue.

## I. PLAINTIFF NEVER AGREED TO BE ASSESSED MULTIPLE FEES ON A SINGLE ITEM THAT THE CONSUMER ONLY PRESENTED FOR PAYMENT ONCE

14. Defendant unlawfully maximizes its already profitable fees through its deceptive and prohibited practice of charging multiple NSF fees, or an NSF fee followed by an Overdraft Fee, on an item that the consumer only presented for payment once.

15. In 2023, the CFPB has stated that:

> The assessment of multiple NSF fees for the same transaction caused substantial monetary harm to consumers, totaling millions of dollars. These injuries were not reasonably avoidable by consumers, regardless of account opening disclosures. And the injuries were not outweighed by countervailing benefits to consumers or competition.

Consumer Fin. Protection Bureau, Issue 29, Winter 2023, Supervisory Highlights Junk Fees Special Edition, *available at* https://www.consumerfinance.gov/data-research/research-reports/supervisory-highlights-junk-fees-special-edition-issue-29-winter-2023/.

16. The Federal Deposit Insurance Corporation (the "FDIC") has expressed concern with the practice of assessing multiple fees on an item. In 2012, the FDIC determined that one bank's assessment of more than one NSF Fee on the same item was a "deceptive and unfair act." *In the Matter of Higher One, Inc., Consent Order*, Consent Order, FDIC-1 1-700b, FDIC-1 1-704k, 2012 WL 7186313.

17. The FDIC also recently recommended that the multiple fee practice be halted entirely. *See* Barbarino, Al. "FDIC Warns Banks About Risks of Bounced Check Fees." Law360, Aug. 19, 2022, *available at* https://www.law360.com/articles/1522501/fdic-warns-banks-about-risks-tied-to-bounced-check-fees.

18. And, in a 2022 issue of *Consumer Compliance Supervisory Highlights*, the FDIC again addressed the charging of multiple non-sufficient funds fees for transactions presented

multiple times against insufficient funds in the customer's account. *See FDIC Consumer Compliance Supervisory Highlights, Mar. 2022, available at* https://www.fdic.gov/news/financial-institution-letters/2022/fil22014.html. FDIC examiners have scrutinized this issue in recent exams, with some exams remaining open pending resolution of the issue.

19. In the Supervisory Highlights, the FDIC discussed potential consumer harm from this practice in terms of both deception and unfairness under the Federal Trade Commission Act Section 5's prohibition on unfair or deceptive acts or practices. The FDIC stated that the "failure to disclose material information to customers about re-presentment practices and fees" may be deceptive. *Id.* at 8.

20. In April 2023, the Office of the Comptroller of the Currency ("OCC") joined in this condemnation in what it referred to as Representment Fee Practices:

> This practice of charging an additional fee each time a single transaction (e.g., ACH transaction or check) is presented for payment by a third party without further action by the customer contributes to customer costs in circumstances in which those customers cannot reasonably avoid the additional charges. Through ongoing supervision, the OCC has identified concerns with a bank's assessment of an additional fee on a representment transaction, resulting in findings in some instances that the practice was unfair and deceptive. Disclosures may be deceptive, for purposes of Section 5, if they do not clearly explain that multiple or additional fees (NSF or overdraft) may result from multiple presentments of the same transaction . . . Consumers typically have no control over when we returned ACH transaction or check will be presented again and lack knowledge of whether an intervening deposit will be sufficient to cover the transaction and related fees.

*OCC Bulletin 2023-12* at 6.

21. Defendant, however, engages in this abusive and deceptive practice in violation of its own Opt-In Form and against the reasonable expectations of its customers.

22. The Opt-In Form allows Defendant to take certain steps when paying a check, in person withdrawal, ATM withdrawal, or other electronic transaction item initiated by the consumer

when the account does not have sufficient funds to cover it. Specifically, Defendant may (a) pay the item and charge a fee; or (b) reject the item and charge a fee.

23. The Opt-In Form explicitly states that a customer will be assessed "an overdraft fee will be assessed for each item returned." **Exhibit A** at 1.

24. This means that "an overdraft fee" (singular) will be assessed for "each item" (singular).

25. In contrast to the Opt-In Form, however, Defendant regularly assesses two or more fees on an item that the consumer only presented for payment once.

### A. The Imposition of Multiple Fees on an Item That the Consumer Only Presented for Payment Once Violates Defendant's Express Promises and Representations

26. The Opt-In Form is a standardized form for share accounts, the material terms of which are drafted by Defendant, amended by Defendant from time to time at its convenience and complete discretion, and imposed by Defendant on all of its deposit accounts.

27. The Opt-In Form provides the general terms of Plaintiff's relationship with Defendant, and therein Defendant makes explicit promises and representations regarding how an item will be processed, and how fees may be assessed.

28. In breach of its promises, Defendant assesses multiple fees per item when Plaintiff only presented the item for payment once (i.e. Plaintiff never re-presented the item for payment).

29. The same item or on an account cannot conceivably become a new one each time it is rejected for payment then reprocessed, especially when—as here—Plaintiff took no action to resubmit it.

30. Defendant and its customers never agreed that Defendant could assess multiple fees on an item when the consumer only presented the item for payment once.

31. Even if Defendant reprocesses an instruction for payment, it is still the same "item." Its reprocessing is simply another attempt to effectuate an account holder's original order or instruction.

**B. Plaintiff's Experience**

32. In support of Plaintiff's claim, Plaintiff offers an example of fees that should not have been assessed against Plaintiff's checking account. As alleged below, Defendant: (a) reprocessed a previously declined item without instruction from Plaintiff; and (b) charged a fee upon reprocessing.

33. On or around August 31, 2021 Plaintiff attempted a transaction via check.

34. Defendant rejected payment of that item due to insufficient funds in Plaintiff's account and charged a $35.00 fee for doing so.

35. Unbeknownst to Plaintiff and without Plaintiff's request to Defendant to reprocess the item, on or around September 1, 2025, Defendant proceeded the item yet again, rejected the item again and charged Plaintiff a second $35.00 fee.

36. *In sum, Defendant charged Plaintiff $70 in fees on an item that Plaintiff only presented for payment once*.

37. Plaintiff understood each payment to be a single item as is laid out in Exhibit A, capable of receiving, at most, a single NSF Fee (if Defendant returned it) or a single Overdraft Fee (if Defendant paid it) so long as Plaintiff did not re-present the item for payment.

## II. DEFENDANT ASSESSES OD FEES ON DEBIT CARD TRANSACTIONS THAT WERE AUTHORIZED ON SUFFICIENT FUNDS

**A. Overview of the Claim**

38. Plaintiff brings this action challenging Defendant's practice of charging OD Fees on what are referred to in this Complaint as "Authorize Positive, Settle Negative Transactions," or "APSN Transactions."

39. Defendant's practice is as follows: at the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Defendant immediately reduces consumers' checking accounts for the amount of the purchase, sets aside funds in the checking account to cover that transaction, and adjusts the consumer's displayed "available balance" to reflect that subtracted amount. As a result, customers' accounts will always have sufficient funds available to cover these transactions because Defendant has already held the funds for payment.

40. However, Defendant still assesses crippling $35.00 OD Fees on many of these transactions and misrepresents its practices in the Opt-In Form.

41. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Defendant later assesses OD Fees on those same transactions when they settle days later into a negative balance. These types of transactions are APSN Transactions.

42. Defendant maintains a running account balance, tracking funds consumers have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Defendant holds the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder and are specifically reserved for a given debit card transaction.

43. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498 (Jan. 29, 2009).

44. That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for pending debit card transactions. Therefore, many subsequent transactions incur OD Fees due to the unavailability of the funds held for earlier debit card transactions.

45. Still, despite always reserving sufficient available funds to cover the transactions and keeping the held funds off-limits for other transactions, Defendant improperly charges OD Fees on APSN Transactions.

46. The Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive.
>
> At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to

> be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, “Supervisory Highlights” (Winter 2015).

47. There is no justification for these practices, other than to maximize Defendant’s OD Fee revenue. APSN Transactions only exist because intervening transactions supposedly reduce an account balance. But Defendant is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year.

48. But Defendant was not content with these millions in OD Fees. Instead, it sought millions more in OD Fees on APSN Transactions.

49. Besides being deceptive, unfair, and unconscionable, these practices breach promises made in Defendant’s Opt-In Form, which fundamentally misconstrue and mislead consumers about the true nature of Defendant’s processes and practices. Defendant also exploits its discretion by implementing these practices to gouge its customers.

50. Federal regulators have repeatedly condemned OD Fees on APSN Transactions where, like here, the financial institution’s Opt-In Form does not expressly and unambiguously permit them.

51. For example, the Consumer Financial Protection Bureau (“CFPB”) ordered Regions Bank to pay $141 million to reimburse consumers for OD Fees on debit card transactions authorized on sufficient funds, noting such fees result from “counter-intuitive, complex processes” and finding them to be “unfair” and “abusive” in violation of federal law. Consent Order, *In the Matter of: Regions Bank*, No. 2022-CFPB-0008 ¶¶ 4, 32, 34, 38 (Sept. 28, 2022) (Dkt. 1), https://bit.ly/3vGDdyx.

52. In December 2022, the CFPB ordered Wells Fargo Bank, N.A. to refund $205 million in such "Authorized-Positive Overdraft Fees" and again declared such practice to be "unfair, deceptive, or abusive" in violation of federal law. Consent Order, *In the Matter of: Wells Fargo Bank, N.A.*, No. 2022-CFPB-0011 ¶¶ 47, 60 (Dec. 20, 2022) (Dkt. 1), https://bit.ly/3ZdnwMM. The CFPB reasoned that "[c]onsumers may be taken by surprise when they incur Authorized-Positive Overdraft Fees because they believed that if they had enough money to cover the relevant transaction when it was authorized they would not incur an Overdraft fee. These Authorized-Positive Overdraft Fees were not reasonable avoidable because they were contrary to consumers' reasonable expectations." *Id.* at ¶ 44.

53. And in its Winter 2023 Supervisory Highlights, the CFPB again stated this APSN practice is "unfair," as "[c]onsumers could not reasonably avoid the substantial injury, irrespective of account-opening disclosures." *Supervisory Highlights Junk Fees Special Edition*, CONS. FIN. PROTECTION BUREAU 4 (Winter 2023), https://tinyurl.com/3ste5dfr. The CFPB explained that "[w]hile work is ongoing, at this early stage Supervision has already identified at least tens of millions of dollars of consumer injury and in response to these examination findings, institutions are providing redress to over 170,000 consumers" and indicated the CFPB intends to continue pursuing such "legal violations surrounding APSN overdraft fees both generally and in the context of specific public enforcement actions[, which] will result in hundreds of millions of dollars of redress to consumers." *Id.*

54. The Federal Reserve has likewise found that OD Fees on debit card transactions authorized on sufficient funds is an "unfair or deceptive" in violation of federal law and advised financial institutions to "[r]efrain from assessing unfair overdraft fees on POS transactions when they post to consumers' accounts with insufficient available funds after having authorized those transactions based on sufficient available funds." *Consumer Compliance Supervision Bulletin:*

*Highlights of Current Issues in Federal Reserve Board Consumer Compliance Supervision*, Fed. Reserve Bd. 12, 13 (July 2018), https://tinyurl.com/44dvnd65.

55. On April 26, 2023, the Office of the Comptroller of the Currency ("OCC") joined the chorus of regulators, issuing a bulletin to banks addressing the risks associated with overdraft protection programs. The OCC addressed APSN practices as follows:

> Some banks assess overdraft fees on debit card transactions that authorize when a customer's available balance is positive but that later post to the account when the available balance is negative.
>
> In this scenario, a customer's account has a sufficient available balance to cover a debit card transaction when the transaction is authorized but, due to one or more intervening transactions, has an insufficient available balance to cover the transaction at the time it settles. This is commonly referred to as an APSN transaction. In addition to assessing an overdraft fee on the APSN transaction, some banks also assess an overdraft fee on intervening transactions that exceed the customer's available balance. In this scenario, for example, the bank reduces a customer's available balance by an amount that is more than, equal to, or less than the initial authorized debit card transaction, and subsequently, an intervening transaction further reduces the customer's available balance so that the account no longer has a sufficient available balance. The bank charges an overdraft fee on both the intervening transaction and the initial APSN transaction when posted to the customer's account.
>
> The OCC has reviewed a number of overdraft protection programs that assess overdraft fees on APSN transactions. In some instances, the OCC has found account materials to be deceptive, for purposes of Section 5, with respect to the banks' overdraft fee practices. In these instances, misleading disclosures contributed to findings that the APSN practice was also unfair for purposes of Section 5. In addition, and based on subsequent analysis, even when disclosures described the circumstances under which consumers may incur overdraft fees, the OCC has found that overdraft fees charged for APSN transactions are unfair for purposes of Section 5 because consumers were still unlikely to be able to reasonably avoid injury and the facts met the other factors for establishing unfairness.

*OCC Bulletin 2023-12: Overdraft Protection Programs: Risk Management Practices*, OFFICE OF COMPTROLLER OF THE CURRENCY (Apr. 26, 2023), https://tinyurl.com/mt63pfnb (footnotes omitted).

### B. Mechanics of a Debit Card Transaction

56. A debit card transaction occurs in two parts. First, authorization for the purchase

amount is instantaneously obtained by the merchant from Defendant. When a customer physically or virtually "swipes" their debit card, the credit card terminal connects, via an intermediary, to Defendant, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

57. At this step, if the transaction is approved, Defendant immediately decrements the funds in a consumer's account and holds funds in the amount of the transaction but does not yet transfer the funds to the merchant.

58. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

59. Defendant (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. For debit card transactions, that moment of decision can only occur at the point of sale, when the transaction is authorized or declined. It is at that point—and only that point—that Defendant may choose to either pay the transaction or to decline it. When the time comes to actually transfer funds for the transaction to the merchant, it is too late for the bank to deny payment—the bank has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. See Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

60. There is no change—no impact whatsoever—to the available funds in an account when the transfer step occurs.

### C. Defendant's Opt-In Form

61. Defendant's Privilege Pay Service is governed by the Opt-In Form. *See* **Exhibit A**.

62. The Opt-In Form promises to assess overdraft fees when there is not enough money in a customer's account. Specifically, it says the following: "[I] understand if funds are not

available in my account, all debits to my account may be returned and an overdraft fee will be assessed for each item returned." *Id.* at 1.

63. In breach of this promise, Defendant assesses $35.00 OD Fees on debit card transactions when there are "funds" "available" in the account.

64. For APSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always sufficient funds to cover or pay a given transaction—yet Defendant assesses $35.00 OD Fees on them anyway.

65. Defendant's Opt-In Form indicates that transactions are only overdraft transactions when funds are not available in the account at the time the customer swipes his or her debit card to pay for an item. Of course, that is not true for APSN Transactions.

66. In fact, Defendant actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to post those same transactions. Instead, it uses a secret posting process described below.

67. All of the above representations and promises are untrue. Defendant charges OD fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Defendant may impose fees on any APSN Transactions.

68. The Opt-In also misconstrues Defendant's true debit card processing and overdraft practices.

69. First, and most fundamentally, Defendant charges OD Fees on debit card transactions for which there are sufficient funds available to cover throughout their lifecycle.

70. Defendant's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates its promise not to do so. This discrepancy between Defendant's

actual practice and the Opt-In Form causes consumers like Plaintiff to incur more OD Fees than they should.

71. Next, sufficient funds for APSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

72. Because these withdrawals take place upon initiation, the funds cannot be re-debited later. But that is what Defendant does when it re-debits the account during a secret batch posting process.

73. Defendant's actual practice is to assay the same debit card transaction twice to determine if it overdraws an account—both at the time of authorization and later at the time of settlement.

74. At the time of settlement, however, an available balance does not change at all for these transactions previously authorized into positive funds. As such, Defendant cannot then charge an OD Fee on that transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

75. Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Defendant releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

76. This secret step allows Defendant to charge OD Fees on transactions that never should have gotten them—transactions that were authorized into sufficient funds, and for which Defendant specifically set aside money to pay.

77. In sum, there is a huge gap between Defendant's practices as described in the Opt-In Form and Defendant's actual practices.

78. Banks and credit unions like Defendant that employ this abusive practice require their accountholders to expressly agree to it—something Defendant here never did.

79. Indeed, recognizing the complexity of the settlement process for APSN Transactions and the fact that a fee in such circumstances is counterintuitive to accountholders, other banks and credit unions require their accountholders to agree to be assessed OD Fees on APSN Transactions.

80. Defendant and its accountholders make no such agreement. The Opt-In Form thus misleads and deceives account holders.

**D. Reasonable Consumers Understand Debit Card Transactions Are Debited Immediately**

81. Defendant's assessment of OD Fees on APSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. This is because if funds are immediately debited, they cannot be depleted by intervening, subsequent transactions. If funds are immediately debited, they are necessarily applied to the debit card transactions for which they are debited.

82. Defendant was and is aware that this is precisely how its accountholders reasonably understand debit card transactions work.

83. Defendant knows that consumers prefer debit cards for these very reasons. Consumer research shows that consumers prefer debit cards as budgeting devices because they don't allow debt like credit cards as the money comes directly out of the checking account.

84. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need To Know About Using A Debit Card?*, ConsumerAction (Jan. 14, 2019), https://bit.ly/3v5YL62.

85. Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." Understanding Debit Cards, Consumer Action, https://bit.ly/2DMeCAD (last visited Jan. 13, 2022).

86. Not only have consumers increasingly substituted debit cards for cash, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

87. Accordingly, "[o]ne of the most salient themes [in complaints to the CFPB] . . . is the difficulty avoiding overdrafts even when consumers believed they would. Often, this was related to bank practices that make it difficult for consumers to know balance availability, transaction timing, or whether or not overdraft transactions would be paid or declined." Rebecca Borne et al., *Broken Banking: How Overdraft Fees Harm Consumers and Discourage Responsible Bank Products*, Center for Responsible Lending 8 (May 2016), https://bit.ly/3v7SvL1.

88. In fact, consumers' leading complaints involved extensive confusion over the available balance and the time of posting debits and credits:

**Figure 3: Top Overdraft Consumer Complaint Issues, by Percentage of Total Complaints**



*Id.*

89. Consumers are particularly confused by financial institutions' fee practices when "based on their actual review of their available balance, often including any 'pending' transactions, [customers] believed funds were available for transactions they made, but they later learned the transactions had triggered overdraft fees." *Id.* at 9.

90. Ultimately, unclear and misleading fee representations like those in Exhibit A mean that consumers like Plaintiff "who are carefully trying to avoid overdraft, and often believe they will avoid it . . . end up being hit by fees nonetheless." *Id.*

91. The Federal Deposit Insurance Corporation ("FDIC") has specifically noted that financial institutions may effectively mitigate this wide-spread confusion regarding overdraft practices by "ensuring that any transaction authorized against a positive available balance does not incur an overdraft fee, even if the transaction later settles against a negative available balance." *Consumer Compliance Supervisory Highlights*, FDIC 3 (June 2019), https://bit.ly/3t2ybsY.

92. Despite this recommendation, Defendant continues to assess OD Fees on transactions that are authorized on sufficient funds.

93. Defendant was aware of the consumer perception that debit card transactions reduce an account balance at a specified time—namely, the time and order the transactions are actually initiated—and the Opt-In Form only supports this perception.

94. Defendant was also aware of consumers' confusion regarding OD Fees but nevertheless failed to make its customers agree to these practices.

**E. Plaintiff Was Assessed an OD Fee on Debit Card Transactions Previously Authorized on Sufficient Funds**

95. As an example, in November and December 2024, Plaintiff was assessed $35.00 OD Fees on debit card transactions, even though the transactions had been previously authorized on sufficient funds.

96. Because Defendant had previously held the funds to cover this transaction, Plaintiff's account always had sufficient funds to cover the transaction and should not have been assessed this fee.

## III. DEFENDANT'S OPT IN FORM MISREPRESENTS DEFENDANT'S OVERDRAFT PRACTICES.

### A. Regulation E Introduces Rules to Protect Consumers from Predatory Overdraft Fees

97. The EFTA, 15 U.S.C. § 1693 *et seq*., is intended to protect individual consumers engaging in electronic fund transfers ("EFTs"). EFT services include transfers through automated teller machines ("ATMs"), point-of-sale terminals, automated clearinghouse systems, telephone bill-payment plans in which periodic or recurring transfers are contemplated, and remote banking programs. Prior to December 2011, the Federal Reserve Board was responsible for implementing the EFTA.

98. The Federal Reserve, having regulatory oversight over financial institutions, recognized that financial institutions had a strong incentive to adopt overdraft programs without giving consumers a choice, since overdraft fees are collected on a nearly risk-free basis. Historically, banks could not decide on overdrafts until after the transaction occurred. Because this entailed a certain amount of risk, financial institutions usually imposed a fee to process the transaction as an overdraft. But as debit card and ATM use rose in popularity, both the number of transactions and the timing of their execution changed. There were more low dollar debit card transactions because debit card use was so convenient, and financial institutions now could either accept or reject transactions at the point of sale. As a result, by simply authorizing these low dollar

transactions into overdraft, banks could collect large fees on low dollar transactions that were almost always quickly repaid. It was a low risk, high reward for the financial institutions while customers suffered the costly effects.

99. And more, these overdraft programs were usually not disclosed to customers, or if so, they were hidden in the middle of a lengthy, boilerplate account agreement. Unlike enrollment in other programs, the customer would be enrolled simply on the word of the banker.

100. The Federal Reserve also noted that "improvements in the disclosures provided to consumers could aid them in understanding the costs associated with overdrawing their accounts and promote better account management." 69 Fed. Reg. 31761 (June 7, 2004).

101. Recognizing that banks and credit unions had strong incentives to adopt these punitive overdraft programs, in 2009, the Federal Reserve Board amended Regulation E to require financial institutions to obtain affirmative consent (or so-called "opt in") from accountholders before the institution could assess OD Fees on ATM and non-recurring "point of sale" debit card transactions. Specifically, Regulation E requires financial institutions to provide consumers with accurate disclosures in understandable language separate from all other information that they could review before they affirmatively consented to enrollment in an overdraft program covering one-time debit card and ATM transactions. Only after a consumer opts-in is the financial institution allowed to assess overdraft fees on these transactions. If a consumer chooses not to opt-in to the financial institution's overdraft service for one-time debit card and ATM transactions, then the financial institution is prohibited from assessing an overdraft fee in connection with any such transaction, regardless of whether payment of the transaction would create an overdraft.

102. Given the state of overdraft programs prior to Regulation E, it is easy to understand why the Federal Reserve was concerned about protecting consumers from financial institutions unilaterally imposing high fees. Banks and credit unions in this scenario had significant advantages

over consumers when it came to imposing overdraft policies. By defaulting to charging fees for point-of-sale transactions, banks and credit unions created for themselves a virtual no-lose scenario—advance small amounts of money for a small period of time, then charge a large fee that is unrelated to the amount of money advanced on behalf of the customer, resulting in a APR of thousands of percent interest, all with almost no risk as only a very small percentage of the overdraft customers failed to repay the overdraft. Moreover, prior to Regulation E, consumers were often automatically enrolled in these punitive overdraft programs.

103. In July 2011, rulemaking authority under EFTA generally transferred from the Federal Reserve Board to the CFPB pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act. The CFPB restated Regulation E at 12 CFR Part 1005 in December 2011.

104. Like the Federal Reserve, the CFPB recognized that overdraft programs had a series of problems. The most pressing problem was that overdraft services were costly and damaging to accountholders. The CFPB estimated that the banking industry had collected anywhere from $12.6 to $32 billion in consumer NSF and overdraft fees in 2011, depending on what assumptions the analyst used in calculating the percentage of reported fee income should be attributed to overdrafts. The CFPB also noted that there were numerous "variations in overdraft-related practices and policies," all of which could "affect when a transaction might overdraw a consumer's account and whether or not the consumer would be charged a fee."

**B. Regulation E's Opt-in Requirement**

105. In response to these issues, the Federal Reserve and CFPB promulgated and restated Regulation E, which requires financial institutions like Defendant to obtain informed consent, by way of a written document that, segregated from all other information, fully and accurately describes the financial institution's overdraft services in an easily understandable way. If an accountholder does not opt-in to the financial institution's overdraft program, the financial

institution must either cover the overdraft without charging a fee or simply decline payment of the transaction at the point of sale. In either scenario, the institution may not charge a fee against the accountholder's account because the accountholder has not consented to participate in the overdraft program.

106. Regulation E also provides that the opt-in disclosure agreement must satisfy certain requirements to be valid. The agreement must be a stand-alone document "segregated from" other forms, disclosures, or contracts provided by the financial institution. The notice must also accurately disclose to the account holder the institution's overdraft charge policies. The accountholder's choices must be presented in a "clear and readily understandable manner." 12 C.F.R. § 205.4(a)(1).

107. The financial institution must ultimately establish that the accountholder has opted-in to overdraft coverage either through a written agreement, or through a confirmation letter to the customer confirming opt-in if the opt-in has taken place by telephone or computer after being provided a compliant opt-in disclosure.

108. Financial institutions are not permitted to circumvent Regulation E's disclosure requirements by reference to or reliance on other account agreements, disclosures, or marketing materials. Rather, Regulation E expressly requires a financial institution to include all the relevant terms of its overdraft program within the four corners of the document, creating a separate agreement with accountholders regarding overdraft policies that is "segregated from" the other lengthy and convoluted documents that collectively set the terms of accountholders' accounts. 12 C.F.R. § 1005.17(b)(1)(i).

109. Regulation E provides a private cause of action for a financial institution's failure to abide by its disclosure requirements. Plaintiff thus seeks restitution of improperly charged OD Fees in violation of Regulation E.

110. Moreover, because Regulation E's requirements are incorporated into the EFTA by way of Section 905(a), 15 U.S.C. § 1693c(a), any violation of Regulation E also violates the EFTA, which is privately enforceable under Section 916, 15 U.S.C. § 1693m.

**C. Defendant's Opt-In Form**

111. Defendant's Opt-In Form fails to provide a clear and unambiguous description of both the how and when its members can expect to be assessed overdraft fees. Exhibit A.

112. Defendant's Opt-In Form does not accurately represent Defendant's actual fee practices because (1) it fails to explain how Defendant determines whether there is enough money in the account to pay a transaction; or (2) it does not explain whether overdrafts are determined at authorization or settlement.

113. Defendant's failure to identify and explain its overdraft program prevents consumers from affirmatively consenting (or opting in) to the program. Rather, after reviewing, the Opt-In Form, consumers are left with no understanding as to how or when Defendant determines overdrafts.

114. Defendant's Opt-In Form thus flouts Regulation E's purpose of "protec[ing]… individual consumers engaging in electronic fund transfers, "12 C.F.R. § 1005.1(b), and requiring Defendant to "[p]rovide[] the consumer with a notice in writing,… segregated from all other information, describing the institution's overdraft service" and "[p]rovide[] a reasonable opportunity for the consumer to affirmatively consent, or opt it, to the service." 12 C.F.R. § 1005.17(b)(1)(i)-(ii).

115. Defendant's Opt-In Form likewise flouts the EFTA's "primary objective," which is the "provision of individual consumer rights." 15 U.S.C. § 1693(b).

116. Defendant's Opt-In Form does not comply with Regulation E or the EFTA's requirements to describe or provide notice of Defendant's overdraft practice. Therefore, pursuant

to Regulation E and the EFTA, Defendant does not have the authority to assess an OD Fee against Plaintiff or other consumers' accounts as a result of any one-time debit card or ATM transaction. 12 C.F.R. § 1005.17(b); 15 U.S.C. § 1693(a).

**D. Plaintiff's Experience**

117. At all times relevant hereto, Plaintiff was enrolled in Defendant's overdraft protection service with respect to one-time debit card transactions and ATM transactions.

118. Defendant charged Plaintiff OD Fees on one-time debit card transactions on numerous occasions.

119. Because Defendant's Opt-in Form did not comply with Regulation E or the EFTA, Plaintiff was unable to predict these fees or affirmatively consent (or opt-in) to Defendant's overdraft program. Hence no OD Fee should have been assessed against her account for these one-time debit card and ATM transactions.

## IV. NONE OF THESE FEES WERE ERRORS

120. The improper fees charged by Defendant to Plaintiff's account were also not errors, but rather were intentional charges made by Defendant as part of its standard processing of transactions.

121. Plaintiff therefore had no duty to report the fees as errors because they were not; instead, they were part of the systematic and intentional assessment of fees according to Defendant's standard practices.

122. Moreover, any such reporting would have been.

## V. THE IMPOSITION OF THESE IMPROPER FEES BREACHES DEFENDANT'S DUTY OF GOOD FAITH AND FAIR DEALING

123. Parties to an agreement like the Opt-In Form are required not only to adhere to the express terms of the agreement but also to act in good faith when they are invested with a discretionary power over the other party. This creates an implied duty to act in accordance with

account holders' reasonable expectations and means that the bank or credit union is prohibited from exercising its discretion to enrich itself and gouge its customers. Indeed, the credit union has a duty to honor transaction requests in a way that is fair to its customers and is prohibited from exercising its discretion to pile on even greater penalties on its account holders.

124. Here, Defendant has provided itself numerous discretionary powers affecting customers' accounts in the Opt-In Form. But instead of exercising that discretion in good faith and consistent with consumers' reasonable expectations, Defendant abuses that discretion to take money out of consumers' accounts without their permission and contrary to their reasonable expectations that they will not be charged improper fees.

125. When Defendant charges improper fees, it uses its discretion to define the meaning of key terms of the Opt-In form in a way that violates common sense and reasonable consumer expectations. Defendant uses its discretion to define that term to choose a meaning that directly causes more fees.

126. Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and its other customers—when it assesses fees in this manner. By always assessing these fees to the prejudice of Plaintiff and other customers, Defendant breaches their reasonable expectations and, in doing so, violates its duty to act in good faith. This is a breach of Defendant's implied covenant to engage in fair dealing and to act in good faith.

127. It was bad faith and totally outside of Plaintiff's reasonable expectations for Defendant to use its discretion to assess these fees.

128. When Defendant charges improper fees in this way, Defendant uses its discretion to interpret the meaning of key terms in the Opt-In Form in an unreasonable way that violates common sense and reasonable consumers' expectations. Defendant uses its discretion to set the meaning of those terms to choose a meaning that directly causes more fees.

## CLASS ALLEGATIONS

129. Plaintiff brings this action on behalf of herself and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of Rule 23.

130. The proposed Classes are defined as:

> **Multiple Fee Class:** All individuals who, during the applicable statute of limitations, were Defendant checking account holders and were assessed multiple fees on an item that the consumer only presented for payment once.
>
> **APSN Fee Class:** All individuals who, during the applicable statute of limitations, were Defendant checking account holders and were assessed an OD Fee on a debit card transaction that was authorized on sufficient funds and settled on negative funds in the same amount for which the debit card transaction was authorized.
>
> **Opt-In Class:** All Defendant consumer checking account holders who, during the applicable statute of limitations, were assessed overdraft fees on one-time debit card transactions or ATM transactions.

131. Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

132. Excluded from the Classes are Defendant, its parents, subsidiaries, affiliates, officers and directors, any entity in which Defendant has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

133. The time period for the Classes is the number of years immediately preceding the date on which this Petition was filed as allowed by the applicable statute of limitations, going forward into the future until such time as Defendant remedies the conduct complained of herein.

134. The members of the Classes are so numerous that joinder is impractical. The Classes consist of thousands of members, the identities of whom are within the exclusive knowledge of Defendant and can be ascertained only by resort to Defendant's records.

135. The claims of the representative Plaintiff are typical of the claims of the Classes in that the representative Plaintiff, like all members of the Classes, was charged improper fees as set forth herein. The representative Plaintiff, like all members of the Classes, has been damaged by Defendant's misconduct. Furthermore, the factual basis of Defendant's misconduct is common to all members of the Classes and represents a common thread of unlawful and unauthorized conduct resulting in injury to all members of the Classes. Plaintiff has suffered the harm alleged and has no interests antagonistic to the interests of any other members of the Classes.

136. There are numerous questions of law and fact that are common to the Classes and those common questions predominate of any questions affecting only individual members of the Classes.

137. The claims of Plaintiff are typical of the claims of the proposed Classes because they are based on the same legal theories, and Plaintiff has no interests that are antagonistic to the interests of the members of the Classes.

138. Plaintiff is an adequate representative of the Classes and has retained competent legal counsel experienced in class actions and complex litigation

139. Among the questions of law and fact common to the Classes include:

a. Whether Defendant charged multiple fees on an item that the consumer only presented for payment once;

b. Whether Defendant charged OD Fees on APSN transactions;

c. Whether these fee practices breached the Opt-In Form and Defendant's duty of good faith and fair dealing;

d. Whether Defendant violated the EFTA and Regulation E;

e. Whether Defendant violated the Arkansas Deceptive Trade Practices Act;

f. Whether Defendant was unjustly enriched by its fee assessment practices;

g. The proper method or methods by which to measure damages; and

h. The declaratory and injunctive relief to which the Classes are entitled.

140. Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions, particularly on behalf of consumers and against financial institutions. Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

141. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the amount of each individual class member's claim is small relative to the complexity of the litigation, no class member could afford to seek legal redress individually for the claims alleged herein. Therefore, absent a class action, the members of the Classes will continue to suffer losses and Defendant's misconduct will proceed without remedy.

142. Even if class members themselves could afford such individual litigation, the court system could not. Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court. Individualized litigation would also create the potential for inconsistent or contradictory rulings. By contrast, a class action presents far fewer management difficulties, allows for the consideration of claims which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale, and comprehensive supervision by a single court.

143. Plaintiff suffers a substantial risk of repeated injury in the future. Plaintiff, like all Class members, is at risk of additional improper fees. Plaintiff and the Class members are entitled to injunctive and declaratory relief as a result of the conduct complained of herein. Money damages alone could not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendant from continuing to commit its unfair and illegal actions.

144. Plaintiffs' class claims are appropriate to proceed under the ADTPA. *See Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393 (2010). Additionally, Act 986

of 2017—which purports to prohibit most private class actions under the ADTPA—is an unconstitutional intrusion into the Arkansas Supreme Court's exclusive authority to "prescribe the rules of pleading, practice and procedure for all courts." Ark. Const. Amend. 80, § 3; *see also Johnson v. Rockwell Automation,* 2009 Ark. 241, 308 S.W.3d 135; *Broussard v. St. Edward Mercy Health Sys.,* 2012 Ark. 14, 386 S.W.3d 385; *Edwards v. Thomas,* 2021 Ark. 140, 2021 Ark. LEXIS 144 (2021); *Mounce v. CHSPSC, LLC,* No. 5:15-CV-05197, 2017 U.S. Dist. LEXIS 160673, at *2 (W.D. Ark. Sep. 29, 2017). To the extent necessary, Plaintiffs seek declaratory relief finding the ADTPA's class action ban unconstitutional.

145. All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSE OF ACTION ONE
**Breach of Contract including Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Multiple Fee Class)**

146. Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

147. Plaintiff and Defendant have contracted for the Privilege Pay Service via the Opt-In Form, as embodied in **Exhibit A**.

148. As explained *supra*, Defendant mischaracterized in the Opt-In Form its true fee practices and breached the express terms of the Opt-In Form.

149. Under Arkansas law, good faith is an element of every contract between financial institutions and their customers because banks and credit unions are inherently in a superior position to their checking account holders and, from this superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

150. Good faith and fair dealing means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the

substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

151. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. A lack of good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing are willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

152. Defendant abused the discretion it granted to itself when it charged multiple fees on an item that the consumer only presented for payment once.

153. Defendant also abused the discretion it granted to itself by defining key terms in a manner that is contrary to reasonable account holders' expectations.

154. In these and other ways, Defendant violated its duty of good faith and fair dealing.

155. Defendant willfully engaged in the foregoing conduct for the purpose of (1) gaining unwarranted contractual and legal advantages; and (2) unfairly and unconscionably maximizing fee revenue from Plaintiff and other members of the Multiple Fee Class.

156. Plaintiff and members of the Multiple Fee Class have performed all, or substantially all, of the obligations imposed on them under the Opt-In Form.

157. Plaintiff and members of the Multiple Fee Class have sustained damages because of Defendant's breach of the Opt-In Form.

158. Plaintiff and members of the Multiple Fee Class have sustained damages because of Defendant's breach of the covenant of good faith and fair dealing.

159. Plaintiff and members of the Multiple Fee Class are entitled to injunctive relief to prevent Defendant from continuing to engage in the foregoing conduct.

## CAUSE OF ACTION TWO

**Breach of Contract including Breach of the Covenant of Good Faith and Fair Dealing (On Behalf of Plaintiff and the APSN Class)**

160. Plaintiff incorporates the preceding paragraphs of this Complaint as if fully set forth below.

161. Plaintiff and Defendant have contracted for the Privilege Pay Service via the Opt-In Form, as embodied in **Exhibit A**.

162. Defendant misconstrued in the Opt-In Form its true OD Fee practices and breached the express terms of the Opt-In Form.

163. Defendant breached the terms of the Opt-In Form by charging OD Fees on debit card transactions were authorized on sufficient funds.

164. Arkansas imposes a duty of good faith and fair dealing on contracts between banks and their customers because banks are inherently in a superior position to their checking account holders because, from a superior vantage point, they offer customers contracts of adhesion, often with terms not readily discernible to a layperson.

165. Defendant abuses its discretion in its own favor—and to the prejudice of Plaintiff and other customers—by charging OD Fees on debit card transactions that were authorized on sufficient funds. This is an abuse of the power that Defendant has over Plaintiff and his bank account, is contrary to Plaintiff's reasonable expectations under the Opt-In Form, and breaches Defendant's implied covenant to engage in fair dealing and to act in good faith.

166. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and

abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

167. Defendant has breached the covenant of good faith and fair dealing in the Opt-In Form through its policies and practices as alleged herein.

168. Plaintiff and members of the APSN Class have performed all, or substantially all, of the obligations imposed on them under the Opt-In Form.

169. Plaintiff and members of the APSN Class have sustained damages because of Defendant breach of the Opt-In Form.

170. Plaintiff and members of the APSN Class have sustained damages because of Defendant's breach of the covenant of good faith and fair dealing.

## CAUSE OF ACTION THREE
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Classes)**

171. Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

172. Plaintiff, individually and on behalf of the Classes, asserts a common law claim for unjust enrichment. This claim is brought solely *in the alternative* to Plaintiff's breach of contract claims and applies only if the parties' Opt-In Form are deemed unconscionable or otherwise unenforceable for any reason. In such circumstances, unjust enrichment will dictate that Defendant disgorge all improperly assessed fees.

173. Defendant has knowingly accepted and retained a benefit in the form of improper fees to the detriment of Plaintiff and the members of the Classes, who reasonably expect to be compensated for their injury.

174. Defendant has retained this benefit through its fee maximization scheme, and such retention violates fundamental principles of justice, equity, and good conscience.

175. Defendant should not be allowed to profit or enrich itself inequitably and unjustly at the expense of Plaintiff and the members of the Classes and should be required to make restitution to Plaintiff and the members of the Classes.

**CAUSE OF ACTION FOUR**
**(Violations of the Arkansas Deceptive Trade Practices Act,**
**Ark. Code Ann. § 4-88-191, *et seq.*)**
**(On Behalf of Plaintiff and the Classes)**

176. Plaintiff incorporates the preceding allegations by reference as if fully set forth herein.

177. The ADTPA is designed to protect consumers from deceptive, unfair, and unconscionable trade practices. The ADTPA is a remedial statute which is to be liberally construed in favor of consumers.

178. Defendant's wrongful actions as described throughout this complaint violate the ADTPA, specifically A.C.A. § 4-88-107(a)(10).

179. As detailed herein, Defendant has violated (and continues to violate) A.C.A. § 4-88-107(a)(10) by unfairly, unconscionably, and deceptively assessing and collecting certain fees on an item in relation to customers' checking accounts in violation of Exhibit A.

180. As a result, Plaintiff and members of the Class have suffered actual financial loss proximately caused by Defendant's unlawful conduct. Plaintiff and other members of the Class suffered actual financial loss proximately caused by their reliance on Defendant's unlawful conduct.

181. Plaintiff and the Classes relied on Defendant's misleading and deceptive fee representations.

182. As a result, Plaintiff and members of the Classes have suffered actual financial loss proximately caused by Defendant's unlawful conduct. Plaintiffs and other members of the Class suffered actual financial loss proximately caused by reliance on Defendant's unlawful conduct.

183. Accordingly, Plaintiff and the members of the Class are entitled to recover their damages, attorneys' fees, and costs pursuant to A.C.A. § 4-88-113.

184. Plaintiff and members of the Class are also entitled to punitive damages. Defendant knew or should have known that its conduct would result in injury to Plaintiff and members of the Class and it continues such conduct in reckless disregard for the consequences.

**CAUSE OF ACTION FIVE**
**Violation of Electronic Fund Transfers Act, 15 U.S.C. § 1693 *et seq.*, and Regulation E, 12 C.F.R. § 1005 *et seq.***
**(On Behalf of Plaintiff and the Opt-In Class)**

185. Plaintiff realleges and incorporates by reference all the foregoing allegations as if they were fully set forth herein.

186. By charging overdraft fees on one-time debit card and ATM transactions without a Regulation E compliant opt-in form, Defendant violated Regulation E (12 C.F.R. §§1005 *et seq.*), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

187. Specifically, the charges violated what is known as the "Opt In Rule" of Regulation E (12 C.F.R. § 1005.17.) The Opt In Rule states: "a financial institution ... shall not assess a fee or charge ... pursuant to the institution's overdraft service, unless the institution: (i) [p]rovides the consumer with a notice in writing [the opt-in notice]. . . describing the institution's overdraft service" and (ii) "[p]rovides a reasonable opportunity for the consumer to affirmatively consent" to enter into the overdraft program. (*Id.*) The notice "shall be clear and readily understandable." (12 C.F.R. §205.4(a)(l).)

188. To comply with the affirmative consent requirement, a financial institution must provide a segregated description of its overdraft practices that is accurate, non-misleading and

truthful and that conforms to 12 C.F.R. § 1005.17 prior to the opt-in, and must provide its customers a reasonable opportunity to opt-in after receiving the description. The affirmative consent must be provided in a way mandated by 12 C.F.R. § 1005.17, and the financial institution must provide confirmation of the opt-in in a manner that conforms to 12 C.F.R. § 1005.17.

189. The intent and purpose of this Opt-In Form is to "assist customers in understanding how overdraft services provided by their institutions operate .... by explaining the institution's overdraft service ... in a clear and readily understandable way"-as stated in the Official Staff Commentary (74 Fed. Reg. 59033, 59035, 59037, 5940, 5948), which is "the CFPB's official interpretation of its own regulation," "warrants deference from the courts unless 'demonstrably irrational,'" and should therefore be treated as "a definitive interpretation" of Regulation E. *Strubel v. Capital One Bank (USA)*, 2016 U.S. Dist. LEXIS 41487, *11 (S.D.N.Y. 2016) (quoting *Chase Bank USA v. McCoy*, 562 U.S. 195, 211 (2011)) (so holding for the CFPB's Official Staff Commentary for the Truth In Lending Act's Regulation Z)).

190. Defendant has failed to comply with the 12 C.F.R. § 1005.17 opt-in requirements, including failing to provide its customers with a valid description of the overdraft program which meets the strictures of 12 C.F.R. § 1005.17. Defendant's opt-in method fails to satisfy 12 C.F.R. § 005.17 because it misrepresents Defendant's overdraft practices,. Namely, Defendant's opt-in form does not inform customers about how and when Defendant determines overdrafts on Plaintiff's one-time debit card and ATM transactions.

191. Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions. Plaintiff and members of the Opt-In Class have been harmed by Defendant's practice of assessing OD Fees

on one-time debit card and ATM transactions when, under Regulation E, Defendant did not have authority to do so.

192. Because Defendant failed to use a Regulation E complaint opt-in disclosure and failed to obtain its customers' affirmative consent as required by Regulation E, Defendant was not legally permitted to assess any overdraft fees on one-time debit card or ATM transactions.

193. The "primary objective" of the EFTA "is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

194. Section 904 of the EFTA states that the CFPB "shall prescribe rules to carry out the purposes of this subchapter." 15 U.S.C. § 1693b(a)(1). The CFPB has prescribed such rules in the form of Regulation E, 12 C.F.R. § 1005, *et seq.*

195. The EFTA's grant of authority to the CFPB includes the authority to issue model clauses "to facilitate compliance with the disclosure requirements of section 1693c of this title and to aid consumers in understanding the rights and responsibilities of participants in electronic fund transfers by utilizing readily understandable language." 15 U.S.C. § 1693b(b). The CFPB issued a model form as Model Form A-9.

196. Section 905 of the EFTA requires that "the terms and conditions of electronic fund transfers involving a consumer's account shall be disclosed . . . . in accordance with regulations of the Bureau." 15 U.S.C. § 1693c(a). Such "terms and disclosures" "shall be in readily understandable language" and include information regarding "any charge for electronic fund transfers or for the right to make such transfers." 15 U.S.C. § 1693c(a)(4).

197. Accordingly, in failing to use a Regulation E-compliant opt-in form, Defendant violated Section 905 of the EFTA by failing to make disclosures "in accordance with regulations of the Bureau."

198. Plaintiff and members of the Opt-In Class have been harmed by Defendant's practice of assessing OD Fees on one-time debit card and ATM transactions when, under Regulation E and the EFTA, Defendant did not have authority to do so.

199. As a result of violating Regulation E's prohibition against assessing overdraft fees without obtaining affirmative consent to do so, Defendant has harmed Plaintiff and the Opt-In Class.

200. Due to Defendant's violation of Regulation E, 12 C.F.R. § 1005.17, and the EFTA, 15 U.S.C. § 1693c, Plaintiff and members of the Opt-In Class are entitled to actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Classes respectfully request the Court enter an Order:

a. certifying the proposed Classes, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class counsel;

b. declaring Defendant's fee policies and practices alleged in this Complaint to be wrongful and unconscionable in light of its promises;

c. enjoining Defendant from breaching its Opt-In Forms and continuing to assess OD Fees in violation of The EFTA and Regulation E;

d. awarding Plaintiff and the Class restitution in an amount to be proven at trial;

e. awarding actual damages in an amount according to proof;

f. awarding pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

g. awarding costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees and costs pursuant to applicable law; and

h. Awarding such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, by counsel, DEMANDS trial by jury.

Dated: November 4, 2025

Respectfully submitted,

*/s/ Christopher D. Jennings*

Christopher D. Jennings
AR Bar No. 2006306
**JENNINGS & EARLEY PLLC**
500 President Clinton Avenue, Suite 110
Little Rock, Arkansas 72201
Email: chris@jefirm.com

Jeffrey D. Kaliel*
**KALIELGOLD, PLLC**
1100 15th Street NW, 4th Floor
Washington, DC 20005
Email: jkaliel@kalielpllc.com

Sophia Goren Gold*
**KALIELGOLD, PLLC**
950 Gilman Street, Suite 200
Berkeley, CA 94710
Email: sgold@kalielpllc.com

**pro hac vice to be filed*

***Attorneys for Plaintiff and the Class***